# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LESLIE PEACE (A-81126), ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 12 CV 9766 |
| v. ) | |
| ) | Judge Charles R. Norgle, Sr. |
| WEXFORD HEALTH SOURCES, ) | |
| INC., DR. IMHOTEP CARTER, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

CHARLES R. NORGLE, SR., DISTRICT JUDGE

Leslie Peace (hereinafter, "Peace" or Plaintiff"), an inmate at Stateville Correctional Center (hereinafter, "Stateville"), has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Peace contends the Defendant, Dr. Imhotep Carter (hereinafter, "Dr. Carter"), who formerly worked as a physician at Stateville, violated his constitutional rights due to a delay in procurement of compression stockings. Peace contends that both Dr. Carter and Wexford Health Sources, Inc. (hereinafter, "Wexford"), were deliberately indifferent to a serious medical condition. This matter is before the Court for ruling on Defendants' motion for summary judgment (Dkt. No. 43). For the reasons stated in this order, the motion for summary judgment is granted as to both Dr. Carter and Wexford.

## I. BACKGROUND

The Court takes the following facts from the parties' Local Rule 56.1 Statements of Material Facts and the supporting evidentiary materials, with any relevant disputes noted.

Peace has been incarcerated since 1994, and at the time of the events alleged in his

complaint, was housed at Stateville. (Defs.' 56.1(a)(3) Statement ¶ 1.) Dr. Carter was a licensed physician and medical director at Stateville at the time of the events alleged in Peace's complaint. *(Id.* at ¶ 2.) Wexford is a medical contractor for the Illinois Department of Corrections and Stateville. *(Id.* at ¶ 3.) Plaintiff's complaint alleges that Carter and Wexford deprived him of medical care due to a delay in getting compression stockings ordered by physician assistant LaTonya Williams for his varicose veins. *(Id.* at ¶ 4.) The compression stockings were ordered by Williams on January 17, 2012. *(Id.)* Peace alleges that Wexford refused to supply him with the compression stockings, and that Dr. Carter did not respond to a letter he sent asking for help in obtaining the stockings. *(Id.)* Peace contends that he went without the stockings from the time they were ordered by Williams in January 2012 until November 2012. *(See* Pl.'s Dep., Dkt. No. 46-1, at 39:20-24.)[1]

Peace has had a number of health problems since entering prison, including a ventral hernia that developed as a result of a gunshot wound to the abdomen sustained during his arrest. (Defs.' 56.1(a)(3) Statement ¶¶ 5, 6.) In addition to varicose veins, Peace has high blood pressure, bleeding hemorrhoids, chest pains, tachycardia, and spinal stenosis. *(Id.* at ¶ 6.) During his 20-year incarceration, Peace has been referred off-site for treatment numerous times, including for surgical repair of the hernia, a consultation at the University of Illinois at Chicago ("hereinafter, "UIC") related to blackouts, an MRI of the brain related to spinal stenosis, colonoscopies at UIC, a consultation at St. Joseph's Hospital for chest pains and high blood pressure in 2009, an EMG at UIC in 2010, and a dermatology evaluation by a doctor in Joliet in 2012. *(Id.* at ¶ 7.) Peace is

---

[1] Peace testified that he has had problems obtaining the compression hose before and since this time frame, but his grievance, and his allegations against Dr. Carter and Wexford, involve this 11-month time frame. *(See* Pl.'s Dep., Dkt. No. 46-1, at 42:4-5.)

suffering from spinal stenosis, a narrowing of the spinal canal that can cause numbness and pain. (*Id.* at ¶ 8.) Peace also has been treated at Stateville for hypertension, chest pain, varicose veins, hemorrhoids, gastrointestinal issues, colds, flu, and rosacea. (*Id.* at ¶ 9.)

Peace was first provided compression stockings in Stateville in 2009. (*Id.* at ¶ 10.) He testified that his compression stockings were taken away by correctional officers in a shakedown and thrown away, although he could not say when this shakedown happened. (*Id.* at ¶ 11.) After this, he told physician assistant Williams what happened, and she wrote a prescription for compression hose on January 17, 2012. (*Id.* at ¶¶ 12, 13.)

According to a declaration provided by Dr. Carter, based on his review of the medical records, the compression hose were not a necessary medical treatment, but rather were an accommodation to Peace to treat a cosmetic condition. (*Id.* at ¶ 14.) Peace disputes this, pointing to a chart copy of the January 17, 2012, prescription order for thigh-high hose. (Pl's. 56.1(a)(3) Statement ¶ 14, *see* Dkt. No. 52, p. 22.) The chart copy is blank in the space labeled "problem," and does not indicate what, if any, condition the hose were prescribed to treat. (Dkt. No. 52, p. 22.)

According to a declaration from Joe Ebbitt, director of risk management for Wexford, Wexford has found no business records indicating it received an order for compression hose for Peace in January 2012. (Defs.' 56.1(a)(3) Statement ¶ 15.) Peace testified that he never received the compression hose, and that he regularly checked on the status of the order with Don Hennely, the medical supply supervisor at Stateville, who told him the order was never filled. (*Id.* at ¶ 16.) Hennely retired, and was replaced as supply supervisor by Joseph Sheehy. (*Id.* at ¶ 17.) According to an affidavit by Sheehy, the medical supply supervisor's duties include ordering and supplying durable medical equipment prescribed for inmates at Stateville. (*Id.* at ¶ 18.) Sheehy performed a

search of the medical supply records at Stateville and found no documentation of orders for compression stockings for Leslie Peace placed prior to April 2012. (*Id.* at ¶ 19.) Since becoming the medical supply supervisor in April 2012, Sheehy has ordered compression stockings for Peace on three occasions, on November 9, 2012, May 6, 2013, and May 8, 2014. (*Id.* at ¶ 20.)

Peace wrote a letter to Dr. Carter on February 7, 2012, in which he complained that he had not received the compression stockings prescribed by Williams on January 17, 2012. (*Id.* at ¶ 21.) Peace put the letter in a box for pickup by the cell house medical technician. (*Id.*) He testified that he does not know whether Dr. Carter received the letter. (*Id.*) Dr. Carter, in his declaration, stated that he did not receive the letter. (*Id.* at ¶ 22.)

Although Peace disputes some of the details of his treatment, it is undisputed that Dr. Carter treated Peace beginning on August 30, 2011, for conditions including mild chronic obstructive pulmonary disorder, a persistent facial rash, and spinal stenosis. (*Id.* at ¶ 23–27.) On February 8, 2012, Dr. Carter renewed a medical permit allowing Peace to have a low bunk and a low gallery, based on his diagnosis of spinal stenosis.[2] (*Id.* at ¶ 27.) The last time Dr. Carter examined Peace was April 9, 2012, for a follow-up concerning his rosacea and cervical spinal stenosis. (*Id.* at ¶ 28.) Dr. Carter did not see Plaintiff again prior to leaving Stateville in 2012. (*Id.* at ¶ 29.)

According to Dr. Carter, at no time during his examination of Peace did Peace have any significant lower extremity edema or any other condition requiring treatment with compression stockings. (*Id.* at ¶ 30.) Dr. Carter stated that he did not treat Peace for his varicose veins, which

---

[2] Peace disputes that he was actually examined by Dr. Carter on this date (Pl's. 56.1(b)(3) Statement ¶ 27) although he appeared to admit as much during his deposition. (See Dkt. No. 46-1, at 59:17-19.) Regardless, there is no dispute that Dr. Carter renewed the medical permit for a low bunk and a low gallery.

4

were a cosmetic issue. (*Id.* at ¶ 31.) Dr. Carter contends that he deferred to the judgment of other healthcare providers in their treatment of Plaintiff's varicose veins and relied on the medical supply supervisor to order durable medical equipment prescribed for Peace, including the compression stockings. (*Id.* at ¶ 32.)

The parties agree that Dr. Carter did not treat Plaintiff's varicose veins, but disagree somewhat as to their interactions regarding the compression hose. Dr. Carter says they did not discuss the issue, and Peace agrees that he did not discuss his varicose veins or compression stockings with Dr. Carter, but only because Dr. Carter would not allow him to speak about these issues. (*Id.* at ¶ 31; Pl.'s 56.1(b)(3) Statement ¶ 31.) Specifically, Peace contends, "[A]s soon as plaintiff would mention anything to do with the denial of the prescribed compression hose, that was the trigger for Dr. Carter to usher plaintiff out from the Health Care Unit." (Pl.'s 56.1(b)(3) Statement ¶ 31.)

## II. DISCUSSION

### A. Standard of Decision

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining the existence of a genuine issue of material fact, a court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Weber v. Universities Research Assoc., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). The court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th

Cir. 2009) (citing *Anderson*, 477 U.S. at 249-50). "The only question is whether there is a genuine issue of fact." *Id.*

However, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Sarver v. Experian Information Solutions*, 390 F.3d 969, 970 (7th Cir. 2004) (internal citations omitted). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Egonmwan v. Cook County Sheriff's Dept.*, 602 F.3d 845, 849 (7th Cir. 2010) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008)).

"If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50. The inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

**B.  Analysis**

Defendants move for summary judgment on various grounds. They contend: (1) that the compression stockings were not meant to treat an objectively serious medical condition, nor did they delay in providing the stockings pose a serious medical risk to Peace; (2) Plaintiff has failed to establish that Dr. Carter and Wexford were involved in the delay in providing the compression

6

stockings; (3) Plaintiff failed to provide evidence sufficient to support a claim that Dr. Carter and Wexford were deliberately indifferent to a serious medical need; and (4) Wexford cannot be held vicariously liable for its employees' alleged deprivations of Peace's constitutional rights.

Prison officials may be held liable for violations of the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference to serious medical needs includes both objective and subjective elements. *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). The objective element requires that an inmate have an objectively serious medical condition, while the subjective element means that a defendant must be subjectively aware of and consciously disregard the inmate's serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle*, 429 U.S. at 103–04; *see also Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would know that a doctor's attention was needed. *See Foelker v. Outagamie County*, 394 F.3d 510, 512–13 (7th Cir. 2005); *Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2007). A condition is also objectively serious if "failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)).

As to the subjective prong of a deliberate indifference claim, a prisoner must demonstrate that the defendant in question was aware of and consciously disregarded the inmate's medical need. *Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 103–04; *King v. Kramer*, 680 F.3d 1013,

1018 (7th Cir. 2012); *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). Neither negligence nor gross negligence constitute deliberate indifference. *Farmer*, 511 U.S. at 836.

Instead, the standard is comparable to that required in demonstrating criminal recklessness. *Id.* at 839. However, a prisoner does not need to prove that the prison official "intended, hoped for, or desired the harm that transpired." *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996). Instead, it is sufficient if the prisoner demonstrates that the prison official actually knew of a substantial risk of harm to the prisoner and acted or failed to act in disregard to that risk. *See Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir 2002). An inmate can demonstrate that a prison official knew of a substantial risk of harm if the fact of that risk is obvious. *Id.* The court examines the totality of the medical care provided; isolated incidents of delay do not rise to the level of deliberate indifference. *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000); *Gutierrez*, 111 F.3d at 1374-75.

### 1.  *Existence of a Serious Medical Need*

Delays in treating painful conditions that are not life-threatening may support Eighth Amendment claims. *See Gutierrez*, 111 F.3d at 1371. However, not every condition that causes discomfort will support a deliberate indifference claim. *Id.* at 1372 (citing *Gibson v. McEvers*, 631 F.2d 95, 98 (7th Cir. 1980) (holding that failure to treat common cold could not amount to deliberate indifference), *Snipes v. DeTella*, 95 F.3d 586, 591 n.1 (7th Cir. 1996) (holding that the failure to treat a toe following toenail removal did not support a deliberate indifference claim); *Oliver v. Deen*, 77 F.3d 156, 159 (7th Cir. 1996) (holding that mild asthma was insufficient to support such a claim)). "A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue--the sorts

of ailments for which many people who are not in prison do not seek medical attention--does not by its refusal violate the Constitution." *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996). Nonetheless, a broad range of conditions may support a deliberate indifference claim, including a dislocated finger, hernia, arthritis, heartburn, and vomiting. *See Roe*, 631 F.3d at 861–62.

In this instance, Defendants argue that the compression stockings were not prescribed to treat an objectively serious medical condition, nor did the delay in providing the stockings pose any serious medical risk to the Plaintiff. Peace, on the other hand, contends the stockings were medically necessary to prevent pain from his bulging veins, and that he experienced severe pain without the hose.

Varicose veins may cause serious medical conditions, or they may not. *Compare Beshears v. Webster,* No. 09-CV-172, 2013 U.S. Dist. LEXIS 52814, at *9 (S.D. Ind. April 12, 2013) (noting that "varicose veins are common, and not usually the sign of a serious medical issue") *with West v. Keve*, 541 F. Supp. 534, 540 (D. Del 1982) (finding 17-month delay in surgery for treatment of varicose veins causing pain supported claim for deliberate indifference). In this case, Dr. Carter contends that, based upon a review of the medical records, the compression hose were merely an accommodation to address the cosmetic issue of Plaintiff's varicose veins. However, Dr. Carter has not pointed to a specific record in support of this conclusion. The fact that the compression hose was prescribed by a medical professional, although the reasons for the prescription are unclear, is some indication that the hose was medical necessary. *See Kramer*, 680 F.3d at 1018 (describing an objectively serious medical need as one that has been diagnosed by a physician as mandating treatment). Further, Peace contends that he suffered pain without the stockings. As such, there are genuine issues of

material fact as to whether the compression stockings were meant to treat an objectively serious medical condition and as to whether the delay in receiving the stockings caused a serious medical risk to Plaintiff. For these reasons, summary judgment in favor of Defendants is improper on the objective prong of Plaintiff's deliberate indifference claim.

2. *Evidence of Deliberate Indifference*

Defendants argue that Plaintiff has failed to provide any evidence that Dr. Carter was in any way involved in the delay in providing Plaintiff with compression stockings, let alone to establish that he was deliberately indifferent. Peace has brought forth no evidence that Dr. Carter was personally involved in the procurement of the compression stockings. Rather, it appears that the stockings were prescribed by Williams and were to be obtained through the medical supply process. This did not occur for reasons that are unexplained, but there is no evidence that any lapses in the supply process were the fault of Dr. Carter. However, Peace contends that Dr. Carter knew or should have known of his problems in obtaining the compression hose, and failed to take appropriate action.

As a preliminary matter, it is undisputed that Williams, not Dr. Carter, was treating Plaintiff for the varicose vein issue. While Plaintiff contends that he tried to talk to Dr. Carter about the compression hose during their appointments, it is unclear precisely what, if anything, Plaintiff said to Dr. Carter about this situation on any given date. More importantly, there is no evidence that Dr. Carter knew of a substantial risk of serious harm to Peace as a result of the delay in receipt of the compression hose.

In this case, Peace's February 7, 2012, letter, which Carter denies receiving, was sent only three weeks after Williams prescribed the compression hose, and only four days after a

chart note from Williams indicating that she would check on the status of the hose. Peace points to this chart note, from February 3, 2012, as evidence that Dr. Carter knew of his predicament and failed to act. (Dkt. No. 52, Ex. B to Pl.'s Resp. to Defs.' Statement of Material Facts.) Directly beneath the chart note are February 8, 2012, treatment notes from Dr. Carter, which Peace argues means that Dr. Carter must have seen the note from Williams and been aware that he was having difficulty obtaining the hose.

Even if this is true, however, and even if Dr. Carter did receive Plaintiff's letter, the chart notes indicate that Williams planned to check on the issue with central supply. Thus, the note would have indicated to Dr. Carter that Williams was handling the issue. *See Smego v. Mitchell*, 723 F.3d 752, 758 (7th Cir. 2013) ("Doctors may rely on the representations of their colleagues absent clear evidence that those representations are known to be false."). The fact that Dr. Carter did not independently follow up as to the status of the compression stockings does not indicate that Dr. Carter deliberately disregarded a substantial risk of harm to Plaintiff.

Peace also points to his January 29, 2012, grievance and subsequent appeal, in October 2012, as evidence that Dr. Carter was aware of his complaints and failed to intervene. However, he presents no evidence that Dr. Carter reviewed the grievance or was aware of the appeal or even working at Stateville at the time of the appeal.[3] It is worth noting that Plaintiff's grievance is dated shortly after Williams ordered the compression hose and before the February 3, 2012, chart note indicating that Williams was checking on the status of the compression hose.

---

[3] Dr. Carter last treated Plaintiff in April 2012 and appears to have left the institution soon thereafter, although the record is not clear as to when Dr. Carter left Stateville. (*See* Defs.' 56.1(a)(3) Statement ¶¶ 28, 29.)

11

Dr. Carter was entitled to expect that Williams, who was treating Peace in regard to the vein issue, would follow up with the supply office and that workers in that office would follow through in handling the ordering of the compression hose. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (noting that it is normal and expected for prison bureaucracies to divide tasks, and holding that the failure of one employee to do another employee's job does not amount to deliberate indifference). Further, there is no evidence that Dr. Carter ever received any information indicating that Plaintiff was at a substantial risk of harm due to the delay in ordering the hose. In the absence of any evidence that Dr. Carter was aware of, and disregarded, a substantial risk of harm to Peace, Peace cannot go forward with his deliberate indifference claim.

### 3. *Claim Against Wexford*

In analyzing a Section 1983 claim against a private corporation, the court applies the same principles applied to examining such claims against a municipality. *Brown v. Ghosh*, No. 09 C 2542, 2010 U.S. Dist. LEXIS 103992, *8 (N.D. Ill. Sep. 28, 2010) (citing *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009)). In particular, there is no *respondeat superior* liability under Section 1983. *Rodriguez*, 577 F.3d at 822; *see Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) (questioning this rule in the context of private corporations, but noting that it remains the law). Rather, a private corporation cannot be held liable under Section 1983 unless the constitutional violation was caused by an unconstitutional custom or policy of the corporation itself. *Shields*, 746 F.3d at 789. Such liability may be demonstrated directly through a showing that the policy itself is unconstitutional, or indirectly by showing a series of bad acts on behalf of the corporation, thus inviting the court to infer that the

policymakers noticed misconduct and failed to act, encouraging or condoning such misconduct. *Estate of Novack v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000).

Plaintiff argues, in a conclusory fashion, that Wexford has a widespread practice of providing minimal medical care to inmates, but provides no evidentiary support for this allegation, nor any evidence of any unconstitutional policies on the part of Wexford. Therefore, summary judgment is granted as to Wexford.

### 4. *Status of Unserved Defendant Dr. Saleh Obaisi*

On April 9, 2013, this Court granted Plaintiff leave to proceed with his complaint against defendants Wexford, Dr. Carter, and Dr. Saleh Obaisi, who succeeded Dr. Carter as medical director at Stateville. At that time, the Marshal was directed to serve Dr. Obaisi, and the Illinois Department of Corrections and/or Wexford were ordered to provide the last known address of any former employees. (*See* Dkt. No. 8.) However, to date, Dr. Obaisi has not been served, nor has Plaintiff raised the issue of service with the court or requested any assistance in serving Dr. Obaisi. On November 14, 2014, this court issued a show cause order requiring Plaintiff to explain within 21 days why this case should not be dismissed as to Dr. Obaisi for failure to prosecute. Plaintiff has not responded. Therefore, all claims against Dr. Obaisi are dismissed pursuant to Fed. R. Civ. P. 41(b). *See Fed. Election Comm'n v. Al Salvi for Senate Comm.*, 205 F.3d 1015, 1018 (7th Cir. 2000) (holding that court has authority both inherently and pursuant to Fed. R. Civ. P. 41(b) to dismiss case as a sanction for failure to prosecute and noncompliance with a court order).

If Plaintiff wishes to appeal this final judgment, he may file a notice of appeal with this court within thirty days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal

*in forma pauperis* should set forth the issues Plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If Plaintiff does choose to appeal, he will be liable for the $505 appellate filing fee irrespective of the outcome of the appeal. *Evans v. Illinois Dept. of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, Plaintiff may also be assessed a "strike" under 28 U.S.C. § 1915(g). The Plaintiff is warned that, pursuant to that statute, if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury.

### III. CONCLUSION

For the foregoing reasons, the motion for summary judgment of Dr. Imhotep Carter and Wexford Health Sources, Inc. (Dkt. No. 43) is granted. Additionally, all claims against Dr. Saleh Obaisi are dismissed pursuant to Fed. R. Civ. P. 41(b) for failure to prosecute. This case is closed.

IT IS SO ORDERED.

ENTER:

CHARLES R. NORGLE, SR., JUDGE
United States District Court

DATE: 12/11/14